## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WILLIAM J. BURGER** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civ. No. 07-326 Erie** |
| | ) |
| **PETER VON KORFF, SANDRA** | ) |
| **VOLGSTADT, and COUNTY OF ERIE,** | ) |
| **OFFICE OF CHILDREN AND YOUTH,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## Opinion and Order

Plaintiff William J. Burger commenced this action against Peter Von Korff, Ph.D.,

Sandra Volgstadt, and the County of Erie, Office of Children and Youth, based on their conduct

in an investigation into allegations of abuse against Plaintiff, the assertion of a charge of serious

mental injury against Mr. Burger, and Defendants' subsequent conduct in child custody

proceedings in the Erie County Court of Common Pleas.

Plaintiff asserts two claims under 42 U.S.C. § 1983. In Count One he alleges that his due

process rights were violated under the Fourth and Fourteenth Amendments to the United States

Constitution. In Count Two, Plaintiff alleges that his rights to free speech and to petition for

redress of grievances under the First and Fourteenth Amendments were violated. Finally, in

Count Three, Plaintiff alleges the state law claim of Intentional Infliction of Emotional Distress.

Presently before the Court are Defendants' motions to dismiss and/or for summary

judgment and Plaintiff's responses thereto. For the reasons stated below we will grant

Defendants' motions.

## I. Background

Plaintiff has sued the County of Erie, Office of Children and Youth ("Erie OCY"); Sandra Volgstadt, a social worker and a supervisor with Erie OCY; and Peter Von Korff, Ph.D., a licenced clinical psychologist under contract with Erie OCY.

Plaintiff, William J. Burger married Nadine Comeau and together they had one daughter, born in 1997. (Compl. ¶ 11.) The family lived together in Brooklyn, New York, until Mr. Burger and Ms. Comeau separated in 1999, with Ms. Comeau and their daughter moving to Erie, Pennsylvania. (Compl. ¶ 11.) A divorce decree was eventually entered in the New York State Supreme Court. (Compl. ¶ 12.) The New York Court also issued an initial custody order, which was eventually superseded by Order of the Erie County Court of Common Pleas. (Compl. ¶ 12.)

Custody issues between Mr. Burger and Ms. Comeau were contentious. (Compl. ¶ 13.) In 2005, Mr. Burger was awarded substantial partial custody of their daughter, and he subsequently filed a petition to become the primary custodial parent. (Compl. ¶¶ 13, 14.) While that petition was pending, an anonymous allegation was made to Erie OCY of suspected sexual abuse of the daughter against Mr. Burger. (Compl. ¶ 14; Child Abuse Expunction Appeal Hearing Transcript, May 1, 2006, at 7, attached as Def. Ex. F to Defendants' Appendix, (hereinafter "Expungement Hearing").) Mr. Burger alleges that the anonymous informant was his ex-wife. (Compl. ¶ 14.)

Based on the allegation of abuse, Erie CYS and Ms. Volgstadt referred the family to Dr. von Korff for a psychological evaluation. (Compl. ¶ 18.) Mr. Burger contends that the referral was made without authority and without instruction to Dr. von Korff to review the situation for evidence of sexual abuse. (Compl. ¶ 18.) Instead, according to Mr. Burger, the referral to Dr.

2

von Korff was made to see what Dr. von Korff could find out about the family dynamics, how the child was doing, and how the family could be "handled." (Compl. ¶ 18.)

Dr. von Korff interviewed Ms. Comeau on five occasions, had two telephone conversations with Mr. Burger, and interviewed their daughter on two occasions. (Compl. ¶ 20.) Mr. Burger alleges that during this process, Ms. Comeau made numerous false and inaccurate allegations. (Compl. ¶ 20.)

Dr. von Korff prepared a "Family Psychological Evaluation" Report, dated July 25, 2005, indicating dates of service of June 19, 2005, June 27, 2005, and July 5, 2005. (Family Psychological Evaluation, July 25, 2005, attached as Def. Ex. B to Defendants' Erie OCY and Volgstadt's Appendix, Doc. 5.) In his "Conclusions and Recommendations," Dr. von Korff stated in part as follows:

> [The daughter's] family situation confronts her with chronic emotional stress that is taking a serious toll on her potential. This situation needs to be addressed.
>
> In the writer's opinion, attention must be directed toward Mr. and Ms. Burger, who have been unable or unwilling to resolve their disputations post-divorce relationship. They must make a greater effort to put their mutual animosities and suspicions to rest.
>
> . . .
>
> No evidence was obtained that specifically pointed to sexual abuse. Rather, the examiner came to view [the daughter's] sexualized behavior as related to her deeply troubled attachments. . . . .
>
> The writer encourages the Agency and the Family Court to press for renewed mediation for these parents. both parents should be brought to recognize the need for family counseling. They should also both support play therapy for [their daughter]. Finally, they should be advised to regard their ongoing dispute as the greatest single threat to their daughter's well being.
>
> It is the writer's view that lack of cooperation with these recommendations - on the part of either parent - could be viewed as grounds for a finding of neglect.

3

The examiner remains available to the caseworker for consultation on these matters.

(Family Psychological Evaluation, July 25, 2005, at 12-14.) Mr. Burger was not provided with a copy of Dr. von Korff's evaluation. (Compl. ¶ 22.) The report of sexual abuse was deemed unfounded by the Erie OCY. (Compl. ¶ 14; Expungement Hearing, at 7-8.)

Mr. Burger alleges that Ms. Comeau enlisted the support of Defendants Ms. Volgstadt and Dr. von Korff as allies in her case against Mr. Burger. (Compl. ¶ 15.) He further alleges that Ms. Comeau made implausible allegations to Ms. Volgstadt and Dr. von Korff that were accepted at face value by Defendants, despite the existence of conflicting evidence. (Compl. ¶ 15.) Mr. Burger also alleges that Ms. Volgstadt and Dr. von Korff "adopted" Ms. Comeau and were determined to become her advocates in the child custody action. (Compl. ¶ 15.)

On September 1, 2005, the Court of Common Pleas of Erie County issued an Order of Court establishing that Mr. Burger and his ex-wife shall share legal and physical custody of their daughter. (Order of Court, September 1, 2005, attached as Def. Ex. C to Defendants' Erie OCY and Volgstadt's Appendix, Doc. 5.) In addition to specific instructions regarding visitation the Order of Court also set forth that the daughter "shall be assessed for counseling as recommended by the school," that the "parents and the child shall participate in family counseling," that the "child shall participate in play therapy," and that the "parents and child shall participate in a custody evaluation." (Order of Court, September 1, 2005, at ¶¶ 2.k, 2.m,, & 2n.)

On September 26, 2005, an "Initial Abuse Report - Intake" form was prepared indicating a referral for "Serious Mental Injury," which prompted an investigation. (Initial Abuse Report, September 26, 2005, attached as Def. Ex. D to Defendants' Erie OCY and Volgstadt's Appendix,

4

Doc. 5.) The Initial Abuse Report indicated that the referral was by telephone from the County

Protective Services, and that the Alleged Perpetrator was "Mom & Dad." (Initial Abuse Report,

Def. Ex. D.) The "Allegations" section of the report states as follows:

> PARENTS CONTINUE TO DRAW THEMSELVES INTO A CUSTODY
> BATTLE OVER CHILD THAT HAS PLACED CHILD IN A SERIOUS
> EMOTIONAL SITUATION. CHILD WAS RECENTLY SEEN BY A
> PSYCHOLOGIST AND SERIOUS CONCERNS EXIST FOR HER
> EMOTIONAL WELL-BEING AS A DIRECT RESULT OF A/P'S ACTIONS.

(Initial Abuse Report, Def. Ex. D.) The Initial Abuse Report also indicates that Ms. Volgstadt

was the Intake Supervisor at the time of the report. (Initial Abuse Report, Def. Ex. D.) The basis

for the Report came from Dr . von Korff. (Compl. ¶ 21.)

On November 22, 2005, Erie OCY filed an indicated report of child abuse, more

commonly known as a form CY-48. (Investigation Report, November 22, 2005, attached as Def.

Ex. G to Defendants' Erie OCY and Volgstadt's Appendix, Doc. 5.) The description section of

the CY-48 stated: "A licensed psychologist has determined that the child has suffered serious

mental injury as a result of the perpetrator's actions and failures to act." (Investigation Report,

November 22, 2005.)

Prior to the September 26, 2005 Initial Abuse Report, Mr. Burger had been critical of and

made complaints to Erie OCY on numerous occasions concerning its involvement in his case and

Erie OCY's refusal to investigate allegations of mental abuse by Ms. Comeau. (Compl. ¶ 24.)

Mr. Burger contends that the Erie OCY retaliated against him by preparing the Initial Abuse

Report because of his comments criticizing the handling of his case. (Compl. ¶ 25.)

On December 8, 2005, Mr. Burger's ex-wife filed a Motion for Emergency Custody in the

Court of Common Pleas of Erie County based on the CY-48 indicated report of child abuse.

5

(Motion for Emergency Custody, December 8, 2005, attached as Def. Ex. H to Defendants' Erie OCY and Volgstadt's Appendix, Doc. 5.) According to the Motion for Emergency Custody the Erie OCY received a report of possible mental abuse by both parents, and that following an investigation the Erie OCY determined that the allegations were unfounded as to the mother, but "indicated" as to the father. (Motion for Emergency Custody, at ¶¶ 6-7.)

A hearing on Ms. Comeau's emergency motion was held on December 8, 2005, in front of Judge Stephanie Domitrovich. (Transcript of Emergency Custody Hearing, December 8, 2005, attached as Def. Ex. E to Defendants' Erie OCY and Volgstadt's Appendix, Doc. 5, (hereinafter "Emergency Hearing").) It was at the December 8, 2005 emergency hearing that Mr. Burger first learned of the CY-48 report. (Compl. ¶ 22.)

Mr. Burger had previously filed a motion to obtain primary custody and have the child relocated to live with him in New York. A hearing on Mr. Burger's motion was set for January 20, 2006 in the Court of Common Pleas of Erie County in front of Judge Dunlavy. (Motion for Emergency Custody, at ¶ 5; Compl. ¶ 14; Transcript of Emergency Custody Hearing, at 3.) On December 8, 2005, in front of Judge Domitrovich, Mr. Burger's ex-wife sought to obtain an Order granting her sole custody of the child, while limiting Mr. Burger to supervised visits only until after the January 20, 2006 custody hearing. (Motion for Emergency Custody, at ¶ 13.)

Ms. Volgstadt testified in person at the hearing. (Compl. ¶ 22; Emergency Custody Hearing Tr., at 8-14.) Dr. von Korff testified by telephone, however he was not aware that the hearing was being held and he was not asked to appear until Judge Domitrovich telephoned him at his Jamestown, New York office. (Compl. ¶ 22; Emergency Custody Hearing Tr., at 15-26.) Following the hearing the Court entered an Order of Court granting Ms. Comeau temporary sole

6

custody of the minor child and limiting Mr. Burger to supervised contact only. (Order of Court, December 8, 2005, attached as Def. Ex. I to Defendants' Appendix.) In addition, based on testimony at the hearing, Judge Domitrovich ordered Mr. Burger to meet with Dr. von Korff on Monday, December 12, 2005, at 1:00 p.m. (Order of Court, December 8, 2005; Emergency Custody Hearing Tr., 23, 26-27.)

The custody hearing set for January 20, 2006, was continued. On February 16, 2006, Mr. Burger filed a Motion to Reconsider Judge Domitrovich's December 8, 2005 Order of Court, which was dismissed as untimely. (Order, February 22, 2006, attached as Def. Ex. J to Defendants' Appendix.) In Judge Domitrovich's dismissal of Mr. Burger's motion, she also directed that Mr. Burger reschedule his December 12, 2005 meeting with Dr. von Korff, which was cancelled due to Dr. von Korff being in an accident. (Order, February 22, 2006.) On February 28, 2006, Mr. Burger filed a Motion to Place Objection on Record and Motion to Reconsider Order, which was dismissed as untimely on March 27, 2006. (Order, March 27, 2006, attached as Def. Ex. K to Defendants' Appendix.) Mr. Burger ostensibly sought reconsideration of the February 22, 2006 Order, however, Judge Domitrovich, citing the substance of the motion, viewed it as a request to reconsider the December 8, 2005 Order directing Mr. Burger to meet with Dr. von Korff, which Mr. Burger had not yet done. (Order, March 27, 2006.)

Mr. Burger filed a timely appeal of the entry of the filing of the CY-48 and an administrative hearing was held by the Department of Public Welfare on May 1, 2006. (Expungement Hearing, May 1, 2006.) Testimony was heard from Ms. Volgstadt, Dr. von Korff, Mr. Burger, Curtis Bannister (who had witnessed an event involving the child), and Jerry Trimble (the principal of the school the child attended). An Adjudication was issued on August

7

31, 2006, in which the Administrative Law Judge recommended that Mr. Burger's appeal be sustained and that his name be expunged from the Childline Registry. (Adjudication, August 31, 2006, attached as Def. Ex. L to Defendants' Appendix.) The Administrative Law Judge found that the testimony of all witnesses was credible. (Adjudication, at ¶¶ 10,11.) She also found that Dr. von Korff did not make a mental health diagnosis of the child, because Erie OCY did not ask for a diagnosis, only an evaluation of family dynamics. (Adjudication, at ¶ 8.) The Administrative Law Judge concluded that the failure to offer a diagnosis proving that the child suffered from a serious mental injury was fatal to Erie OCY's case and thus found that it had failed to meet its burden to establish that the child suffers from a serious mental injury as defined by the regulations. (Adjudication, at p. 5.) Erie OCY's appeal from the Adjudication was denied. The CY-48 was expunged, and Mr. Burger regained his custody rights in 2007.

Mr. Burger alleges that as a result of the actions of Erie OCY, Ms. Volgstadt, and Dr. von Korff, he was deprived of any meaningful contact with his daughter from December 8, 2005, through June, 2007. (Compl. ¶ 23.) He claims in Count One that the Defendants deprived him of his substantive familial relationship rights without due process because Defendants did not have probable cause to establish that Mr. Burger had caused serious mental injury to his daughter; that the CY-48 finding was entered in bad faith; that Ms. Volgstadt and Dr. von Korff intentionally sought to deprive Mr. Burger of partial custody of his daughter at the December 8, 2005 hearing knowing that there was no probable cause for the CY-48; and that all Defendants conspired in bad faith to impede Mr. Burger's efforts to regain custody. (Compl. ¶ 30.) He thus claims a violation under 42 U.S.C. 1983 for deprivation of his rights without due process in violation of the Fifth and Fourteenth Amendments.

8

In Count Two, Mr. Burger alleges that all Defendants acted in concert to retaliate against him for complaining about the handling of his case and for attempting to secure redress for those complaints. (Compl. ¶ 35.) Mr. Burger therefore sets forth a claim of a violation under 42 U.S.C. 1983 for deprivation of his right to free speech and to petition for redress of grievances in violation of the First and Fourteenth Amendments.

Finally, in Count Three, Mr. Burger sets forth a claim of Intentional Infliction of Emotional Distress alleging that all Defendants acted deliberately and with actual malice with the intention of damaging, destroying or diminishing the quality of Mr. Burger's relationship with his child. (Compl. ¶ 39.) Specifically, he alleges that the Defendants' conduct with regard to the filing of the CY-48 and participation in the custody case was outrageous. (Compl. ¶ 40.)

## II. Standard of Review

Defendants have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative for summary judgment pursuant to Federal Rule of Civil Procedure 56, based on matters submitted outside the Complaint. Defendants have attached documents to their pleadings, primarily undisputed court documents concerning the child custody proceedings and the expungement hearing. We conclude that the parties have provided all material pertinent to our disposition of this motion as a motion for summary judgment and will therefore treat it as such. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c), Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

9

## III. Discussion

Defendants Erie OCY and Sandra Volgstadt, with Peter von Korff, M.D. joining in, move for summary judgment on all counts. We first address Defendants' argument that Mr. Burger's constitutional claims must be dismissed because there is no genuine issue of material fact that Defendants had objectively reasonable grounds upon which to base the charge of child abuse and that the evidence supports that the Defendants' conduct does not shock the conscience. Next, we address Defendants' arguments regarding absolute and qualified immunity. Finally, we address Mr. Burger's state law claim of intentional infliction of emotional distress asserted in Count Three.

### A. Constitutional Claims

Mr. Burger alleges that Defendants deprived him of his relationship with his child and deprived him of partial custody of his child. Mr. Burger complains that Defendants conspired in bad faith to deprive him of his rights by relying on biased and false information in its investigation and report, failing to conduct a thorough and appropriate investigation, and failing to adhere to the law in filing a charge of child abuse against him. Central to Mr. Burger's Complaint is his assertion that the CY-48 was not supported by a diagnosis of Mr. Burger's child; specifically, that there was not a diagnosis of a "serious mental injury" as defined in 23 Pa.C.S.A. § 6303(a). Finally, Mr. Burger alleges that Defendants violated his constitutional rights by retaliating against him for complaining to the Agency about how his case was being handled and for his attempt to seek redress of those complaints.

The United States Court of Appeals for the Third Circuit has recognized a liberty interest in familial integrity, described as "the constitutionally protected liberty interests that parents have

10

in the custody, care and management of their children." Croft v. Westmoreland County Children & Youth Serv., 103 F.3d 1123, 1125 (3d Cir. 1997), see also Santosky v. Kramer, 455 U.S. 745, 753 (1982). "The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process." Croft, 103 F.3d at 1125. "This interest, however, must be balanced against the state's interest in protecting children suspected of being abused." Miller v. City of Philadelphia, 174 F.3d 368, 373 (3d Cir. 1999)(citing Croft, 103 F.3d at 1125; Millspaugh v. County Dept. of Public Welfare, 937 F.2d 1172, 1175-77 (7th Cir. 1991)). "The right to familial integrity, in other words, does not include a right to remain free from child abuse investigations." Croft, 103 F.3d at 1125 (citation omitted).

"When executive action is at issue, a violation of the Fourteenth Amendment right to substantive due process may be shown by conduct that 'shocks the conscience.'" A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 579 (3d Cir. 2004) (quoting Lewis, 523 U.S. at 846-47). "Negligent conduct is never egregious enough to shock the conscience, but conduct intended to injure most likely will rise to the level of conscience-shocking." A.M.,372 F.3d at 579 (citing Lewis, 523 U.S. at 849). "In between these two extremes is a middle range of conduct known as deliberate indifference, which may rise to the level of conscience-shocking in certain circumstances." A.M., 372 F.3d at 579 (citing Lewis, 523 U.S. at 849-50). For liability to attach in a section 1983 claim challenging a social worker's decision to remove a child from a parent, "'the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed "shocks the conscience."'" Ziccardi v. City of Philadelphia, 288 F.3d 57, 64 (3d Cir.

11

2002) (quoting Miller, 174 F.3d at 375-376.)

The Third Circuit has noted that "there may be cases in which a child services bureau may be justified in removing either a child or parent from the home, even where later investigation proves no abuse occurred." Croft, 103 F.3d at 1126. A child agency must, however, have "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id. (citations omitted). Our focus is "whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference . . . ." Id.

Defendants argue that the evidence available to them concerning Mr. Burger's interactions with his child was sufficient to establish a reasonable suspicion that Mr. Burger had inflicted serious mental injury upon the child. We agree.

Erie OCY received an allegation of sexual abuse against Mr. Burger. Pursuant to their statutory duties they began an investigation, which in part included a referral to Dr. von Korff to conduct a psychological evaluation. The charge of sexual abuse was deemed unfounded sometime in June, 2005. Dr. von Korff completed his evaluation by July 5, 2005, and submitted his report dated July 25, 2005.

Dr. von Korff stated in part that the child had "chronic emotional stress that is taking a serious toll on her potential[, and that the] situation needs to be addressed." (Family Psychological Evaluation, at 12.) Dr. von Korff pointed to both parents as the cause of the stress stating that they "have been unable or unwilling to resolve their disputatious post-divorce relationship [and they] must make a greater effort to put their mutual animosities and suspicions to rest." (Family Psychological Evaluation, at 12.) Dr. von Korff encouraged

12

the Agency and the Family Court to press for renewed mediation for these parents. both parents should be brought to recognize the need for family counseling. They should also both support play therapy for [their daughter]. Finally, they should be advised to regard their ongoing dispute as the greatest single threat to their daughter's well being.

(Family Psychological Evaluation, at 13.) Finally, he stated his view "that lack of cooperation with these recommendations - on the part of either parent - could be viewed as grounds for a finding of neglect." (Family Psychological Evaluation, at 14.) The September 1, 2005 Order of Court establishing joint custody incorporated provisions from Dr. von Korff's recommendations such as family counseling and play therapy for the child.

On September 26, 2005, the Erie OCY prepared the Initial Abuse Report indicating a referral for "Serious Mental Injury" identifying the perpetrators as both the mother and father. (Initial Abuse Report, Def. Ex. D.) Specifically, the report stated that the parents continued to draw themselves into a custody battle over their child, which was causing a "serious emotional situation" in the child. (Initial Abuse Report.) The report also cites to Dr. von Korff's evaluation of the child and a serious concern for the emotional well-being of the child as a result of the mother and father's actions. (Initial Abuse Report.) Following an investigation Erie OCY filed an indicated report of child abuse dated November 22, 2005, also known as for CY-48. The Cy-48 indicated that a "licensed psychologist has determined that the child has suffered serious mental injury" as a result of Mr. Burger's actions and omissions. (Investigation Report, November 22, 2005.)

The record evidence shows that before filing the indicated report of child abuse Ms. Volgstadt reviewed Dr. von Korff's written report, consulted with the psychologist who performed a court-ordered custody evaluation, consulted with the Safe Harbor Behavioral Health

13

counselor involved with the family, and consulted with Dr. von Korff. (Expungement Hearing, at 9-10; Emergency Hearing, at 10-11.) Ms. Volgstadt explained that the agency had concerns about both parents but did not have evidence to support an indicated report of child abuse against Mr. Burger's ex-wife because she did not have malicious intent to cause emotional harm, had been involved with her daughter, and had complied with the Erie OCY's recommendations. (Emergency Hearing, at 12.)

Dr. von Korff's testimony at both the Expungement Appeal Hearing and the Emergency Hearing demonstrates that he acted professionally and appropriately in his evaluation, his written report, and in his oral report to Ms. Volgstadt. Dr. von Korff's written report is extensive, detailed, and thorough, and his testimony concerning his evaluation and his opinions was likewise extensive, detailed, and thorough. Dr. von Korff met with the mother and the child several times and had spoken with the father on the telephone on two occasions for less than ten minutes. He also testified that he based his conclusions and recommendations mainly on testing data obtained from the child. (Expungement Hearing, at 88.)

Mr. Burger disingenuously criticizes Defendants for filing the CY-48 without first fully discovering information from Mr. Burger. However, the record evidence consistently and clearly shows that Mr. Burger evaded Defendants good faith attempts to have meaningful interactions with him.

Sandra Vogstadt explained at the December 8, 2005 Emergency Hearing that Mr. Burger was asked "to meet with Dr. von Korff for a further assessment[,] [h]e continued to tell my worker he'd be available, he would not be available, he would call back, and he did not call back to make himself available. . . . " (Emergency Hearing, at 12.) Ms. Volgstadt further

14

explained at the Expungement Hearing as follows:

> ... I had many conversations with Mr. B. on the phone, to let him know what we had suggested, recommended. He did not tell me he was not willing to comply with them. He said I'll get back to you. He did not get back to us. We phoned him again and said it's imperative for you to follow through with this. I think there were some conversations with Dr. von Korff that he had by phone. they were trying to schedule a time. . . . .

(Expungement Hearing, at 17.)

Dr. von Korff's testimony is consistent with Ms. Volgstadt's. He began by explaining

why he was able to issue his report, despite the fact that he had never met with Mr. Burger in

person:

> I've met with his daughter extensively. I wrote about a 15 page report. I included in that report a lot of detailed information. More detail than I would normally include because I wanted to be clear on the kind of fantasy experience, emotional experience, internal experience that she has in relationship to her father.
> I think I did a good job of that in my report. I don't believe I needed to meet with Mr. Burger in order to make this assessment, although I offered to meet with Mr. Burger.

(Emergency Hearing, at 18). The following exchange then occurred between the Judge and Dr.

von Korff:

JUDGE DOMITROVICH: . . .

I do understand that you did give notice to the father on numerous occasions to indicate that he could be a part of this interview; is that correct?

THE WITNESS: That's correct. I spoke with him by phone. I let him understand that I would make any and every accommodation to see him. I knew he came to Erie on an occasional basis, and I said to him essentially, you name the time and the date and I'll see you.

JUDGE DOMITROVICH: Very well. Was that only once or were there other contacts with him? Did you send him notice by mail or - -

THE WITNESS: Frankly, your Honor, I didn't need to. He spoke with me personally over the phone. He was being repeatedly requested by agency staff to

15

make arrangements to see me. He was clearly aware this was his responsibility to do so. He solely decided that was not something he was going to do.

JUDGE DOMITROVICH: He acknowledged that to you on the phone.

THE WITNESS: Actually, on the phone he did indicate to me that he was - - I do recall that he did indicate he did not expect to make plans to see me. But I believe that was stated at the end of our phone call, and I'm going back several months in memory. I do recall that.

(Emergency Hearing, at 19-20.)

After Judge Domitrovich noted that Dr. von Korff is a well-qualified clinical

psychologist, Mr. Burger's counsel interjected, "He's never met my client," (Emergency

Hearing, at 22), which prompted the following exchange:

JUDGE DOMITROVICH: Well, your client has had the opportunity.

[COUNSEL]: He lives in New York.

JUDGE DOMITROVICH: [To Mr. Burger] Do you want to meet with Dr. von Korff? Are you willing to do so?

WILLIAM BURGER: Sure.

JUDGE DOMITROVICH: When?

WILLIAM BURGER: Tell me when. I'm here.

(Emergency Hearing, at 22-23.) The Judge then immediately arranged a meeting for Mr. Burger

to meet with Dr. von Korff at 1:00 p.m. the following Monday. (Emergency Hearing, at 23.)

Later in the hearing, Judge Domitrovich again brought up the issue of why Mr. Burger did

not meet with Dr. von Korff.

JUDGE DOMITROVICH: . . .
. . . - - why didn't you go and see Dr. von Korff before this - -

[COUNSEL]: Your honor, he lives in New York.

16

JUDGE DOMITROVICH: Well, I want to ask him, why didn't you do that?

WILLIAM BURGER: I was given one opportunity to meet with Dr. von Korff., he offered me a chance to come to Jamestown I think last summer. This was the only one I ever had. It was one of the two times I spoke to him. It happened I wasn't available to go to Jamestown that day.

(Emergency Hearing, at 25.) Upon hearing Mr. Burger's unsworn testimony, Dr. von Korff

interjected himself into the conversation to correct Mr. Burger's statement:

PETER VON KORFF: That is a patently false statement that Mr. Burger just made.

JUDGE DOMITROVICH: Okay.

PETER VON KORFF: Mr. Burger well knows that he had opportunities to see me, that he was requested to see me by myself, by agency staff and that he had a green light and an open date. And it was simply said to him, simply give me the time and day we'll meet.

(Emergency Hearing, at 25-26.) Mr. Burger did not dispute Dr. von Korff's correction of Mr.

Burger's testimony.

After this exchange, Mr. Burger's counsel informed the Court that he was advising his

client not to meet with Dr. von Korff. (Emergency Hearing, at 26.) In response, Judge

Domitrovich stated that if Mr. Burger does not meet with Dr. von Korff she would find that Mr.

Burger was refusing to comply with a Court Order, and she then ordered him to participate.

(Emergency Hearing, at 26-27.) Mr. Burger stated that he would not defy the Court's order.

(Emergency Hearing , at 27.) Thus, it is clear that Judge Domitrovich accepted Dr. von Korff's

sworn testimony over that of Mr. Burger's unsworn testimony.

At the Expungement Hearing, the Administrative Law Judge found that all of the

witnesses that testified were credible, including Ms. Volgstadt and Dr. von Korff. At that

17

hearing Dr. von Korff explained that when he receives a request to evaluate a family it is his

preference to work with the parents before he meets with the child. (Expungement Hearing, at

51.) When asked what occurred in Mr. Burger's case, Dr. von Korff stated:

> What happened in this case was that I was unable to meet with Mr. B. He
> declined to participate in the assessment as requested, and I ended up meeting
> simply with [his ex-wife] and [the child].

(Expungement Hearing, at 51.) Dr. von Korff explained that he had had one telephone

conversation with Mr. Burger. (Expungement Hearing, at 53.) He went on to describe the

conversation as follows:

> . . . I indicated in [my] report [Mr. Burger] indicated that he was busy and didn't
> have much time to talk. He also indicated that he was very distressed about . . .
> his circumstances with [his child] and with his custody arrangements. And he –
> so on the one hand, he indicated he had a lot of distress. On the other hand, he
> indicated he didn't have the time to talk to me. I let him know that he could call
> and talk with me. He was supposed to see me, he was welcome to see me, I never
> received another phone call or visit from him.

(Expungement Hearing, at 53.)

Mr. Burger's counsel, in an apparent attempt to show that Dr. von Korff only relied on

information from his ex-wife and deliberately chose not to seek input from Mr. Burger, stated to

Dr. von Korff, "You said you didn't need to interview Mr. B. to make your finding?"

(Expungement Hearing, at 80.) Dr. von Korff replied as follows:

> That's not accurate at all. I said that I intended to see both parents before I even
> worked with the child. That was my initial request. When you asked me about
> information that I have on the child, the reason that [the information] only comes
> from [his ex-wife] is because she's the only one that participated.

(Expungement Hearing, at 80.) Defense counsel continued along these lines later and the

following exchange occurred:

18

Q. You did, however, in making your conclusion rely in large measure on statements that were made to you by [his ex-wife]?

A. That is absolutely false. No, I relied mainly on test data from [the child].

Q. So you didn't really need to interview [his ex-wife] either, then?

A. I don't know why you would suggest that. My comment at the beginning of this examination was that my intention was to meet with both parents, that my intention is always to meet with both parents before I meet with the child. I'm operating under the limitations that are imposed by Mr. B. and I'm trying to function as best I can under those limitations. So I'm at least listing the things that I did here from Mrs. B. in his absence and I'm also basing my conclusions on the testing that I did with [the child].

(Expungement Hearing, at 88.)

During the Expungement Hearing, Mr. Burger's sworn testimony as to his interaction with Dr. von Korff was extremely limited. He testified that he spoke to Dr. von Korff on "at least two occasions" and possibly three, but that he could only substantiate one conversation. (Expungement Hearing, at 137-138.) In his Declaration attached to his Response to Defendants' Motions, Mr. Burger states that he called Dr. von Korff "on two occasions to discuss matters with him." (Declaration of William J. Burger, at ¶ 4.) He testified that the conversations were less than ten minutes. (Expungement Hearing, at 138.)

His counsel never asked Mr. Burger whether the Erie OCY and Dr. von Korff attempted numerous times to get Mr. Burger to participate in the evaluation, but that Mr. Burger refused. Instead, Mr. Burger's counsel asked him the irrelevant question, whether there was "any reason that you did not want to go into detail and reveal your deepest secrets to Dr. von Korff?" to which Mr. Burger responded, no. (Expungement Hearing, at 138.) Significantly, Mr. Burger did not testify under oath that he was only given one opportunity to meet with Dr. von Korff, like he

19

did at the Emergency Hearing when he was not under oath. In fact, he admitted in his later-filed Declaration that since the charge of sexual abuse was unfounded before he had a chance to meet with Dr. von Korff he "made no further attempt to schedule an appointment with him." (Declaration of William J. Burger, at ¶ 4.)

Thus, the record evidence abundantly shows that Defendants attempted in good faith to bring Mr. Burger into the process during its investigation but that Mr. Burger chose not to participate in a meaningful manner.

Our review of the record evidence demonstrates that the actions taken by Defendants were based on a careful consideration of the charge of child abuse reported against both parents. Based on the record evidence we find that Defendants had more than sufficient "reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused" Croft, 103 F.3d at 1126. Here, "the information available to the defendants at the time . . . created an objectively reasonable suspicion of abuse justifying" the filing of an indicated child abuse report. Id. The record evidence demonstrates that the Defendants proceeded with deliberation and attempted to be as thorough as possible in conducting their investigation. We cannot say that the manner in which Defendants proceeded "shocks the conscience."

Mr. Burger rests his opposition to Defendants' motions primarily on the fact that Dr. von Korff did not provide a diagnosis of "serious mental injury." Section 6303(a) of Title 23 of the Pennsylvania Statutes defines "serious mental injury" in relevant part as a "psychological condition, as diagnosed by a physician or licensed psychologist, . . ." 23 Pa.C.S.A. § 6303(a). Because of this lack of a diagnosis Mr. Burger argues that the finding of an indicated report of child abuse did not comply with the statute, that therefore the charge of child abuse cannot be

20

based on articulable evidence, and that this conduct "shocks the conscience."

Mr. Burger also argues that Defendants lacked "substantial evidence" to enter the CY-48 because they lacked the requisite diagnosis. However, it is not our task to determine whether substantial evidence existed to support the filing of the CY-48. Our task is to determine whether Defendants' conduct is such that it "shocks the conscience" by determining whether there was "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Croft, 103 F.3d at 1126.

It is evident that Mr. Burger primarily relies on his successful expungement appeal as a basis for filing this lawsuit. It appears that he may believe that because he won his appeal that therefore, as a matter of logic, Defendants must have violated his rights. This is not the law. While it is unfortunate that Mr. Burger suffered in this process we note that his "right to familial integrity, . . . , does not include a right to remain free from child abuse investigations." Croft, 103 F.3d at 1125. We find nothing in the conduct of Defendants that shows inappropriate, negligent, or indifferent conduct, much less conduct that "shocks the conscience."

It is undisputed that Dr. von Korff did not diagnose the child with a severe mental injury. Dr. von Korff readily admitted that he did not diagnose the child. He testified as follows:

It's not typical for me . . . to list an Axis I, II, III, IV, V diagnosis at the end of a report. That's more sort of a clinic language. I have worked in clinics, I can do that, but I don't typically do that form my reports for the Agency. It's not something that's relevant to their work. My reports to the agency - - if I feel that a child needs to be seen in a clinic and needs to be treated, then that's what I say, and I don't typically give them Axis I through V [diagnoses].

(Expungement Hearing, at 72.) Ultimately, the Administrative Law Judge determined that without the diagnosis the Erie OCY "cannot prove [Mr. Burger] perpetrated serious mental

21

injury . . . ." Adjudication, at 5.) The Administrative Law Judge also stated that because

there was no diagnosis, the Erie OCY "cannot meet its burden of proving the indicated report

filed against [Mr. Burger] is being correctly maintained." (Id. at 5.) Therefore, the indicated

report was expunged.

Mr. Burger has also not provided any evidence for his assertion that Ms. Volgstadt was

ignorant of the statutory requirements for finding that someone committed child abuse. The

evidence is to the contrary. Relevant to this case, section 6303(b) defines child abuse as an

"act or failure to act by a perpetrator which causes nonaccidental serious mental injury to . . . a

child under 18 years of age." 23 Pa.C.S.A § 6303(b)(1)(ii). Section 6303(a) defines

"Indicated report," which was eventually what was filed by Ms. Vogstadt, as

> A child abuse report made pursuant to this chapter if an investigation by the
> county agency or the Department of Public Welfare determines that substantial
> evidence of the alleged abuse exists based on any of the following:
>
> (1) Available medical evidence.
> (2) The child protective service investigation.
> (3) An admission of the acts of abuse by the perpetrator.

23 Pa.C.S.A § 6303(a). and section 6303(a) also defines "serious mental injury" as follows:

> A psychological condition, as diagnosed by a physician or licensed
> psychologist, including the refusal of appropriate treatment, that:
>
> (1) renders a child chronically and severely anxious, agitated, depressed, socially
> withdrawn, psychotic or in reasonable fear that the child's life or safety is
> threatened; or
>
> (2) seriously interferes with a child's ability to accomplish age-appropriate
> developmental and social tasks.

23 Pa.C.S.A § 6303(a)

Ms. Vogstadt testified that when the agency files a charge of emotional abuse it needs

"a psychologist to say there is serious mental injury. We have that from Dr. von Korff."

(Emergency Hearing, at 11.) Ms. Volgstadt was asked at the Expungement Hearing the

definition of "serious mental injury," and she responded as follows:

> I didn't have the specifics. I had an act or failure to act which caused the child
> - - I don't remember the exact terminology. I'd have to refer to my CPSL
> [Child Protective Services Law] or something that one of our attorneys had
> given to me at the office.

(Expungement Hearing, at 45-46.) She then testified that she had consulted with an Agency

attorney, reviewed the CPSL, and the definition section. (Expungement Hearing, at 45-46.)

This evidence shows that Ms. Volgstadt had reviewed the relevant law. Specifically, she was

aware that a serious mental injury charge must be supported by a psychologist. In fact, Dr.

von Korff did support the filing of the indicated report based on a serious mental injury and

reiterated his support at length at two separate hearings.

Dr. von Korff explained in great detail his evaluation, impressions, and conclusions

about the child. Ms. Volgstadt testified that Dr. von Korff reported to her that the child was

"intense, high strung, complex and emotionally disturbed." ( Expungement Hearing, at 26.)

Ms. Volgstadt deferred to Dr. von Korff's medical opinion that the child's serious emotional

difficulties were caused by the father. See K.R. v. Department of Public Welfare, 950 A.2d

1069 (Pa.Cmwlth 2008) (agency's deference to medical belief that child's diagnosed spastic

colon arises from emotional stress caused by parent is sufficient for indicated report of

emotional abuse). Under all the circumstances, the fact that Dr. von Korff did not provide a

diagnosis does not amount to a deprivation of constitutional rights. The indicated report was

expunged for a legal reason: the failure to actually state a diagnosis as required by statute. Mr.

23

Burger would have us impute an evil motive to Defendants for the lack of a diagnosis, but it is clear that the record evidence shows no such evil motive and in fact demonstrates that Defendants acted in good faith.

A review of Ms. Vogstadt's and Dr. von Korff's testimony shows that rather than a grand conspiracy to deprive Mr. Burger of his constitutional rights Defendants had gathered sufficient evidence to provide a reasonable basis upon which Dr. von Korff could have based a diagnosis, had he in fact been asked to provide a diagnosis. Mr. Burger then may or may not have succeeded at his expungement hearing, but it is evident that the lack of a diagnosis was not because there was a lack of an evidentiary basis for a diagnosis.

Finally, we address two of Mr. Burger's complaints about Defendants' investigation First he complains that Defendants failed to contact the child's school to see how she was doing. He argues that Defendants would have discovered how well his daughter was doing at school and that Defendants willfully did not want to discover that information. This argument fails for several reasons. Dr. von Korff explained that the child was smart enough and capable enough to mask her emotional and mental difficulties in school and social situations so that they would not be readily apparent. (Expungement Hearing, at 91-92.) He also explained that school performance, on its own, would not confirm or disconfirm whether a child was suffering from a psychological problem. (Expungement Hearing, at 82.) Finally, even the principal of the child's school testified that the school had recommended that the family undergo counseling. (Expungement Hearing, at 116.)

Mr. Burger also complains that his ex-wife's report of an incident involving their daughter that occurred at a neighbor's pool "figured prominently" in Dr. von Korff's report

24

and testimony. (Declaration of William J. Burger, at ¶ 9.) This complaint is unpersuasive. An objective review of Dr. von Korff's report demonstrates that this incident did not figure prominently. In addition, not only did Dr. von Korff testify that he discounted information he received solely from Mr. Burger's ex-wife in coming to his conclusions, but also he testified in detail that his concern about the pool incident came directly from information he obtained from the child during his evaluation. (Expungement Hearing, at 93-94.) He explained as follows:

What [the child] had indicated to me was that she had - - she acknowledged that she had spent an inordinate amount of time underneath the pool – underneath the water and that she was aware that the adults, certainly her mother present, was concerned about it. What she explained - - how she explained this incident to me was in an excited tone, an almost cheerful, excited way, she talked about how it was peaceful under the water.

Now, that's a rationalization, and no doubt, it may be true that it was peaceful under the water for her. But what I experienced when I talked with her about this was that she was rationalizing behavior that was also - - had other connotations in that it was frightening to other people. and what I sensed from her was that this is an example of a rationalized act. . . .

(Expungement Hearing, at 93-94.) Defense counsel then asked Dr. von Korff if his conclusions in his report would be affected by information that showed that the incident did not occur as reported, and Dr. von Korff responded, "I would have to say no. My conclusions in my report are based upon testing experience with [the child]." (Expungement Hearing, at 95.) We note that Mr. Burger does not challenge his daughter's interpretation of the incident as reported to Dr. von Korff.

Mr. Burger barely offers a responsive argument to Defendants' motions regarding his First Amendment claim. His entire argument consists of one paragraph and is limited to alleging that Ms. Volgstadt testified that one of the reasons she filed the CY-48 was because

25

Mr. Burger had threatened to sue everybody. (Plaintiff's response to Defendants' Motions, at 12.) In fact, Ms. Vogstadt's testimony was that Mr. Burger's conduct in threatening to sue everybody contributed to delaying therapy for his child, which in turn was causing emotional harm to his child. There is no indication of a retaliatory motive and as set forth above Defendants' filing of the CY-48 had a rational and articulable basis.

### B. Absolute and Qualified Immunity

Based on our discussion set forth above of Defendant' conduct in this case, we find that Defendants' conduct was objectively reasonable and in accordance with clearly established law such that they are entitled to qualified immunity. We also agree with Ms. Volgstadt that she is entitled to absolute immunity regarding participating in court custody proceedings, such as the December 8, 2005 Emergency Custody Hearing as it relates to Mr. Burger's constitutional claims. Hughes v. Long, 242 F.3d 121, 125 (3d Cir. 2001).

### C. Intentional Infliction of Emotional Distress

In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff "must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." Reeves v. Middletown Athletic Ass'n, 2004 PA Super 475, *17 (Pa.Super. 2004) (citing Hoy v. Angelone, 554 Pa. 134, 151 (Pa. 1998). "In addition, a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct. Reeves, 2004 PA Super 475, *17 (citation omitted).

Pennsylvania defines 'outrageous or extreme conduct' as conduct that is "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." Id. (quoting Hoy,

26

at 151 (citing Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. 1987)). The Pennsylvania Supreme Court explained that another way to describe 'outrageous or extreme conduct' is: "'it has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.'" Hoy, 554 Pa. at 151 (quoting Restatement (Second) of Torts § 46, comment d; Daughen v. Fox, 372 Pa. Super. 405, 412, 539 A.2d 858, 861 (1988).)

We find that the conduct alleged by Mr. Burger does not rise to the level so as to be regarded as "atrocious, and utterly intolerable in civilized society." In addition, Mr. Burger has not alleged the necessary physical harm to state a claim.

We also note that Ms. Volgstadt is entitled to qualified immunity under the Child Protective Services Law, section 6318(a), for this claim, and that Erie OCY is absolutely immune under the Pennsylvania Tort Claims Act. Accordingly, we will grant Defendants' motion for summary judgment as to Mr. Burger's claim of intentional infliction of emotional distress.

## IV. Conclusion

We focused our discussion on the conduct of Ms. Volgstadt and Dr. von Korff because it is apparent from Mr. Burger's Complaint and Brief in Opposition that he believes that these two Defendants' conduct was willful and outrageous. Our discussion of the record evidence, however, demonstrates that these Defendants acted in good faith and conscientiously. We are aware that dismissal of this Complaint would also be justified for reasons not set forth in this

27

Opinion, such as the fact that the deprivation complained of -- the loss of meaningful contact with his child -- could not have occurred but for Mr. Burger's ex-wife filing the emergency motion and Judge Domitrovich's actions in granting that motion. Neither of these parties are named as defendants. In addition, Dr. von Korff's actions were limited to conducting an evaluation, issuing his report, consulting with Erie OCY staff, and testifying when asked at two hearings. It is not at all clear that his conduct would even qualify him as a state actor. Nonetheless, for the reasons set forth above we will grant Defendants' motions for summary judgment.

We have reviewed the record here exhaustively. As a judge with eleven years previous experience in Family Court, these types of cases arise all too often -- parents are so selfishly wrapped up in their own conflicting emotions that they fail to see the harm they are doing to their child. In this case, the parents were told time and again by the professionals involved that their actions were causing symptoms of stress in their child, but the Plaintiff refused to engage in family counseling and therapy with the welfare of the child in the forefront. Instead this Plaintiff attempted to raise this family dispute to the federal level. The Federal courts are not designed to deal with domestic issues of this sort.

An appropriate Order follows.

February 10, 2009
Date

Maurice B. Cohill, Jr.,
Senior District Judge

28